IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PEOPLE OF THE STATE OF MICHIGAN,

              Plaintiffs,

vs.

BRIAN WILLIAM KEELY,

              Defendant.

Case No. 1:24-cr-115
ORAL ARGUMENT REQUESTED

HON. HALA Y. JARBOU
Chief District Court Judge

-----------------------------------------------------------/
ORONDE C. PATTERSON, P57211
ERIKA A. TUSAR, P56831
JOHN S. PALLAS, P42512
Assistant Attorneys General
Michigan Department of Attorney General
Criminal Trials Division
3030 W. Grand Blvd. #10-200
Detroit, MI 48202
(313) 456-0180
pattersono@michigan.gov
tusare@michigan.gov
pallasj@michigan.gov
------------------------------------------------------------------
MARC E. CURTIS, P59274
Attorney for Defendant
800 E. Ellis Rd.
Norton Shores, MI 49441
(231) 375-0971
mcurtis@defenderoftheblue.com
------------------------------------------------------------------

**MOTION IN LIMINE TO PREVENT IMPERMISSIBLE EVIDENCE OF THE VICTIM'S CHARACTER**

**ORAL ARGUMENT REQUESTED**

Motion

NOW COME THE PEOPLE OF THE STATE OF MICHIGAN, by and through Dana Nessel, Attorney General and Assistant Attorneys General, Oronde Patterson and Erika Tusar and respectfully move this Honorable Court to prevent testimony concerning the victim's character at trial.

Brief in Support

*Facts*

The Michigan State Police began an investigation regarding the death of Samuel Da Jon Sterling (hereafter Sterling) on or about April 17, 2024. The investigation revealed that the fatal incident occurred at the Burger King located at 5260 Eastern Avenue, Kentwood, MI 49508 at approximately 11:23 am. It is alleged that Sterling had outstanding warrants, and the Metropolitan Pattern Crime Team (MPACT) asked for assistance to apprehend victim Sterling. The Taskforce consisting of law enforcement from the Michigan State Police Department, Kentwood Police Department, Wyoming Police Department, Kent County Sherrif's Department, Grand Rapids Police Department, Metropolitan Pattern Crime Team (hereafter MPACT) and the United States Marshal's Office Task Force (hereafter USMCTF) was attempting to apprehend individuals with outstanding criminal warrants, including Sterling. During the alleged attempt to apprehend Sterling, the defendant was driving an unmarked Hyundai Palisade SUV styled vehicle and pinned Sterling against the wall at the Burger King. Sterling later succumbed to his injuries.

*Argument*

Two initial points.  First, for the purposes of this motion in limine it is important to bear in mind that we are referring to the victim Sterling's past record *not* the defendant's past record.  Sterling is not on trial in the case at bar and as such the details of his alleged past character are not in issue and are impermissible character evidence under FRE 404(A) and FRE 404(B).  Second, one of the main issues in this case was the *method and manner* in which the defendant attempted to apprehend and detain Sterling.

With that said, there are several issues that the People anticipate will arise.  First, whether there was a possibility that Sterling may have been armed during the apprehension based on past observations and surveillance of Sterling, second, the nature of Sterling's outstanding warrants, and third, whether he had a history of fleeing and eluding police.  These issues overlap to some extent, so these issues are not necessarily addressed in this order.

According to the MPACT)/ Wyoming ID "Operations" Plan (hereafter Ops Plan), it is alleged that the victim, Sterling "is a convicted felon, with a history of fleeing from the police. Currently absconding from probation.  Intel indicates the possibility of Sterling being in possession of a handgun" and "Sterling previously fled from KWPD on January 20, 2024, and has made recent FB posts regarding the fleeing from police."  The Ops Plan indicated that "numerous surveillance assets [were] in place including a pole cam at this location, real time phone GPS, GPS on a rental vehicle operated by Sterling." (Exhibit A)

Upon closer examination not all of this information was accurate based a review of the actual police reports. Upon information and belief, the People have been informed a pole cam was put in place by Kent County PD, no search warrant for the pole cam was obtained and the actual footage was not preserved (other than a few still shots which are discussed below). Although there is no expectation of privacy for the outdoors, there is a requirement that the footage, if relied upon, is preserved so the triers of facts can make their own observations on issues of material facts in dispute.

According to Detective Eagan's report (24-011098) "various surveillance had been set up, and on numerous occasions Sterling was seen entering and exiting the residence and driving the white Equinox. The view of the video surveillance (Pole Cam) was a view that was visible by any person walking/driving on 52nd and Kimball (public places that are free for anyone to travel on). Video surveillance (Pole Cam) was set up to avoid detection from Sterling or any occupants at the address."[1]

This indicates that this footage was of significance to the investigation and should have been preserved accordingly. It was not and cannot now be recovered.

---

[1] Report 24-011098 also goes on to mention that this pole cam was placed there because of Sterling's history and warrants (violence, weapons) and information he is likely to flee from police.

Officers used and relied on this pole cam surveillance footage in the days prior to the coordinated Ops Plan too.[2] Kentwood police report 2024-7382 indicates, "On April 15, 2024, at 12:04 pm Sterling was observed as he entered the Equinox 31EGTP at 1317 52nd St, SE, Kentwood, MI putting a black lunchbox into the vehicle along with a cell phone.  Sterling was also observed removing his hooded sweatshirt and adjusting his pants, a rectangular object was "printing" in his right front pocket.  Given his mannerisms, body language and prior history involving firearms it was suspected Sterling was in possession of a handgun."[3]

Although selected still screen shots from the pole cam footage were preserved on this prior occasion (two days before incident), reasonable minds could differ on the content and what is depicted in the photographs.  The conclusion of what is "allegedly depicted" in the still photographs is not only "speculative" but "subjective," and infringes on the trier of fact's own ability to make a conclusion of the evidence, especially because this footage was not preserved properly.

There is at best mere speculation that Sterling had a weapon since Sterling was never stopped or investigated at all on this occasion, making it not relevant. Furthermore, it is prohibited testimony under FRE 801 because it would be used to

---

[2] Per D/Sgt report -sup 0005, 2 audio files were obtained from Kent County on dispatch channels PD SOUTH and PD WEST after the incident due to a FOIA request.   He was not provided audio files on either channel before/during incident because all relevant radio traffic before and during the incident was conducted on H EVENT 18.  The summary of the recordings indicate surveillance started at the Sterling home on 4/17/24 at approximately 9:10:25 on 4/17/24.
[3] Sterling was never stopped or arrested for any alleged activity on this occasion.

prove the truth of the matter asserted to wit; if there was an object in his pocket, and the object was a weapon.

Under FRE 401, 402, and 403 any testimony regarding the "allegation of the object being a weapon" is irrelevant because it doesn't even rise to the level of being a fact in the first place.  Sterling was never stopped or investigated, and the "alleged object" was never recovered.  There was no substantial evidence that he would have been armed and dangerous. It was mere speculation that on the day of the incident and in the two days prior Sterling might have been carrying a weapon. There is no evidence that substantially shows that Sterling was in fact armed. Therefore, it is not even necessary to get to a balancing test.

Thus, testimony about an "alleged incident" without any facts to support it should not be allowed at trial.  It is anticipated that defense may try to introduce the still images of the pole cam and/or elicit testimony from testifying witnesses to establish that Sterling was a possible threat and the need for drastic measures to stop Sterling from fleeing was necessary by the defendant or that Sterling was armed and a dangerous on this occasion.  All of which amounts to impermissible character evidence.

This evidence and anticipated testimony should be barred under FRE 404(a)(1) (Character Evidence) which clearly states "Prohibited use.  Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Although 404(A)(2) does allow for exceptions, those exceptions are subject to FRE 412 which

is not applicable since this is not a sexual assault case or in a homicide case where the victim was the first aggressor FRE 404(C).  In other words, there is no indication on the facts of this case that the defendant will be asserting a claim of self-defense.

Further, the incident leading to the charges against defendant was captured on scout car footage and body worn cameras.  And at no time in any of that footage is Sterling seen doing anything more than run away from the officers to avoid apprehension.  Running away is *not* an act of aggression.

Testimony or evidence about Sterling being in possession of a weapon either on the date of the incident or in the days prior would also be prohibited under FRE 404(b)(1), which states - Other crimes, wrongs, or acts. "Prohibited use.  Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

The Sixth Circuit has established a three-step inquiry to determine the admissibility of other acts evidence under FRE 404(b):  First, the court must decide whether there is sufficient evidence that the other act in question actually occurred. Second, if so, the court must decide whether the evidence of the other act is probative of a material issue other than character. Third, if the evidence is probative of a material issue other than character, the court must decide whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect.  *U.S. v. Jenkins*, 345 F.3d 928, 938 (6th Cir. 2003).

Looking at the first *Jenkins* prong, to further support the People's position that Sterling was unarmed on the day of the incident in particular, report 2024-7382 indicates "Sterling was observed at 1317 52nd Street (via Pole Cam) and surveilled to 815 52nd St (Speedway) where an apprehension was attempted by MPACT and the USMSTF detectives." Multiple reports indicate the members of the apprehension team were in constant communication with each other on the various radio channels during the surveillance of Sterling and they started the surveillance with the aid of the live feed footage from the Pole Cam. Sterling was continually monitored from his home to the Speedway, where the first attempt at takedown occurred. Sterling fled from officers from the Speedway and up until the final apprehension at the Burger King.

In addition, a Preliminary Examination was held in 62B District Court on August 12, 2024, before the Honorable Judge Amanda Sternkenburg. Detective Ross Eagan, supervisor of MPACT testified there was pre-surveillance that started at approximately 8am on April 17, 2024, and that they always try to monitor a suspect for weapons. Detective Eagan stated during his testimony that no weapons were observed during pre-surveillance, throughout the apprehension, nor were any weapons found on Sterling based on either his own observation or informed by any members during the apprehension of Sterling.[4]

---

[4] See Preliminary Examination Transcript Vol. I page 17 line 1 thru page 81 line 25, testimony of Ross Eagan. Also, page 19 lines 13-16, page 25 lines 15 thru page 26 lines 12 and page 34 lines 5 through 14.

As for prior dates when it is alleged that Sterling may have had a weapon, the People respectfully submit even if the Court were to find statements about "possible weapons" two days prior as otherwise admissible they would not be relevant unless and until the defendant choses to take the stand.  The defendant cannot substitute what other officers may have thought for his own state of mind.  FRE 801(C)(1)(2) and 803(3).

In short, the evidence of the stills from the pole cam and any testimony relating to the possibility Sterling had a weapon must be prohibited because it is not relevant to these proceedings, and it is prohibited pursuant to FRE 404

Next, the People anticipate that there may be an issue regarding the allegation in the Op's Plan that "Sterling previous fled from KWPD on January 20, 2024, and has made recent FB posts regarding fleeing from police"

A copy of the allegation from Kentwood Police Department (KWPD) was provided in incident report #2024-1290 in the discovery package.  The report indicates that there was an attempt to stop a 2023 White Dodge Charger, for failing to use its turn signal at an intersection.  The vehicle fled at a high rate of speed and a "LEIN query showed the vehicle being a rental, and no owner information was given."  The pursuit was called off at one point and "neither the author of the report nor the MSP helicopter was able to locate the vehicle."  Most importantly, it is clearly written on the police report **"I was unable to identify the driver of the vehicle when I attempted to stop it."**  At a later point, other KPD officers were

only able to determine the vehicle was a rental car rented by Andrica Cage (Sterling's mother).  Officers went to the Sterling home and located the rental car.

Officers surrounded the home.  Eventually, Ms. Cage came out and was questioned about the vehicle.  The report indicates that she was "adamant that no one had been driving the vehicle, but she could not confirm it."  Per the report, Ms. Cage told the officers that her son Samuel (Sterling) was in Las Vegas.  The report is silent on any efforts to verify this information.  When Ms. Cage chose to exercise her constitutionally guaranteed rights under the Fourth Amendment and denied the officers permission to search her home, she was told by the officer "that he believed she was being untruthful and did in fact know who was driving the vehicle."

There is no indication that a search warrant was ever sought to search the location for the driver which could have been an option if the officer had probable cause to show who the driver actually was.  It appears they did not, presumably because even the officer attempting to stop the vehicle couldn't make an identification of the driver.  The vehicle was however impounded and towed from Ms. Cage's home.

Further investigation and inquiries were made into this report and upon information and belief no warrant was ever submitted to a prosecutor's office for fleeing and eluding based on this report because the driver of the vehicle could not

be identified.[5] The nearest the officers came to connecting Sterling as the alleged driver during this alleged fleeing and eluding incident in January is months later when it's mentioned in the reports for the case at bar that on 4/15/24 an officer saw an alleged post made by Sterling on social media. Upon information and belief, the alleged post was not preserved when viewed and was found to be removed when officers went to retrieve it on 4/18/24, a day after this incident (referenced report 2024-7382).

Evidence of such an alleged incident should not be allowed because the driver could not be identified, no warrant was ever submitted, there was no follow up on Sterling's actual location at time of the alleged fleeing incident, any alleged social media posting came months later, and it was not preserved. Thus, no verifiable corroboration Sterling was the alleged perpetrator of a fleeing and eluding incident in January.

Application of multiple federal rules of evidence compel a conclusion that such evidence should not be permitted. Under FRE 401(a), such evidence is irrelevant because it does not have the tendency to make a fact more or less probable than it would be without the evidence. Further, even assuming the evidence is relevant, it's not admissible because this "allegation" doesn't even rise to the level of being a fact in the first place so there is no balancing test to be done. There is not even probable cause to support the allegation.

---

[5] Michigan Attorney General investigator Willie Smith spoke to D/Sgt. Matthew Belk on 11/13/24 and was told that a warrant was not submitted to the local prosecutor's office because they could not identify the driver.

FRE 404A(1) Character Evidence clearly states: "Prohibited use.  Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."  Further, the testimony is also prohibited under FRE 404(b)(1), which states-Other crimes, wrongs, or acts. "Prohibited use.  Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

One form of unfair prejudice involves the risk that the prior act could cause the jury to reach a verdict based on emotions instead of evidence. *Old Chief v. United States*, 519 U.S. 172, 180 (1997).  This may occur when, for example, the prior-act evidence so shocks the conscience that the jury may decide that the defendant is a bad person and deserves to be convicted, even if his guilt were unproven as in the instant case, "because a bad person deserves punishment." *Id.* at 181. Certainly, a jury is more likely to engage in this type of judgment when the prior-conduct evidence portrays the defendant as having committed an appalling act.

This kind of use of evidence is exactly what the rules were designed to prevent.  Making an accusation to paint Sterling in the most unfavorable light possible by asserting that somehow on the date at issue he conformed with unverifiable past behavior-to wit: fleeing and eluding.[6]

---

[6] It is also important to remember that Sterling is not on trial in this case.

Some aspects of Sterling's criminal history and the fact of there being outstanding warrants for his arrest should also be prohibited.

According to the MPACT/Wyoming ID Ops Plan, it was believed that "Sterling has a history of robbery…" The plan indicates that Det Woolam confirmed the warrants on April 17, 2024. Also according to the OP's Plan the officers stated that "Sterling CCH includes CCW, robbery, flee/elude MV, R&C stolen firearm, possession by felon, domestic incidents." Additionally, Sterling was "currently absconding from probation." The plan indicates that the warrants were confirmed on April 17, 2024.

But, upon information and belief, Sterling's record at the time of the incident is in fact different than what is reflected in the OP's Plan. At the time of the incident, Sterling was wanted for:

 a. 8/16/23- Larceny from a person and domestic violence- GRPD-Outstanding Warrant
 b. 3/10/23-Carrying a concealed weapon, felon in possession of a firearm and domestic violence- Kentwood-Outstanding Warrant
 c. 10/18/21 Case #21-02644-FH-Carrying a concealed weapon and felon in possession- Probation of violation warrant-Kent County-1/9/23
 d. 10/18/21 Case #21-02102-FH- Fin Trans Device- Kent County- Violation of probation warrant 1/9/23
 e. 4/5/22- Traffic-GRPD-Failure to appear warrant
 f. 4/3/23- Traffic-GRPD-Failure to appear warrant

Sterling's entire criminal convictions consisted of:

 a. Conviction 9/17/2015 JUVENILE- Att. B & E w/o intent- Misdemeanor. Kentwood
 b. Conviction 12/16/2015 Larceny from Person-Felony Kent County

      c. Conviction 8/24/2017 Use of Marijuana -Ordinance Violation- Kentwood
      d. Conviction 8/14/2017 Unlawful driving away an automobile
      e. Conviction 8/21/2021 Financial Transaction- Active probation violation warrant during incident
      f. Conviction 8/12/2021 Carrying concealed weapon and felon in possession of firearm (a receiving and concealing a firearm was dismissed)-Active probation violation warrant during incident
      g. The active warrants listed above (CCW/FIP/DV and Larceny from a Person/DV and the 2 traffic warrants.

Although the fact that Sterling had outstanding warrants is relevant for why the officers were attempting to apprehend Sterling on April 17, 2024, the finite details of each warrant are not.[7] Information about the finite details of the individual warrants should not be allowed at trial.

A conviction and an outstanding warrant are not treated the same way for criminal history purposes. An outstanding warrant is an allegation yet to be adjudicated and a defendant maintains the presumption of innocence guaranteed under the Constitution. A great deal of caution should be exercised when dealing with unadjudicated allegations, especially, when the unadjudicated matters include a domestic relationship undertone as they do in this case.

---

[7] Under police report #2023 it is alleged that Sterling and his parents got into an argument, he brandished a gun while arguing with his father (pulled from waist band and pointed at the ground) and left when his father called 911. When police arrived, his father is alleged to have told officers that Sterling stated "he would shoot it out with police" and "that he always carries a gun." His father also told officers Sterling comes back at night. i.e. he was not hard to find. Under report #2023-047569 it is alleged that Sterling and the mother of his child got into an altercation when she cut off service to his phone. Sterling is alleged to have dragged her, grabbed her phone, hit her with her phone, and then throw it in a neighbor's yard.

There is no guarantee that although warrants were signed, they would have made it to a final resolution stage. Thus placing details about the warrants before the trier of fact cause a great risk that Sterling would be judged as "a person that is bad and needed to be punished." *Old Chief*, 519 U.S. at 180.

FRE 404A(1) Character Evidence clearly states: "Prohibited use. Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."

Further, such details are also prohibited under FRE 404(b)(1), which states- Other crimes, wrongs, or acts. "Prohibited use. Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

Although FRE 404(2) does have exceptions, as noted above, it has limitations in FRE 412 not applicable here since this is not a sexual assault case or in a homicide case where the victim was the first aggressor. FRE 404(C). Again, there is no indication that the defendant will be claiming self-defense.

Alternatively, if this Court were to deem that some detail about Sterling's outstanding warrants or criminal history admissible, this Court should ensure that it is accurate. Allowing inaccurate information regarding Sterling's alleged history before the trier of fact would result in misleading the jury under FRE 403.

WHEREFORE the People respectfully ask this Honorable Court to prohibit any impermissible character evidence, including but not limited to testimony and/or photos that Sterling "possibly" having a weapon two days prior to the incident or insinuating that Sterling "may have had a weapon" on the day of the incident, that Sterling had a history of fleeing and eluding officers or any inaccurate criminal history or details of any unadjudicated outstanding warrants at trial.

    Respectfully submitted,

    DANA NESSEL
    Michigan Attorney General

    /s/ ORONDE C. PATTERSON, P57211
    Assistant Attorney General

    /s/ ERIKA A. TUSAR, P56831
    Assistant Attorney General

    /s/ JOHN S. PALLAS, P42512
    Assistant Attorney General

    Criminal Trials Division
    3030 W. Grand Blvd. #10-200
    Detroit, MI 48202
    (313) 456-0180