UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STATE OF MICHIGAN,

    Plaintiff,

v.

BRIAN WILLIAM KEELY,

    Defendant.
_____/

Case No. 1:24-cr-115

Hon. Hala Y. Jarbou

# **OPINION**

The State of Michigan has charged Defendant Brian William Keely with second-degree murder and involuntary manslaughter under state law for his actions on April 17, 2024, that led to the death of Samuel Da Jon Cornelius Sterling. On that date, Keely and other members of a federal task force attempted to apprehend Sterling based on several warrants for Sterling's arrest. As Sterling fled on foot, Keely pursued him in a police vehicle. Keely's vehicle collided with Sterling, pushing him into a brick wall. Sterling subsequently died from his injuries.

After the State charged Keely, he removed the matter to this Court, asserting he was a federal officer acting under federal authority when attempting to arrest Sterling. The Court held a hearing on his status as a federal officer and concluded that removal was proper. *See Michigan v. Keely*, No. 1:24-cv-682, 2024 WL 3934001, at *7 (W.D. Mich. Aug. 26, 2024).

Before the Court is Keely's motion to dismiss the charges against him on the basis of immunity under the Supremacy Clause of the U.S. Constitution (ECF No. 36). The Court held an evidentiary hearing on the matter on April 21-22, 2025, and then allowed the parties to submit

supplemental briefing. After reviewing the evidence and briefing, the Court will grant the motion and dismiss the case.

## I. BACKGROUND

### A. Task Force Officer Keely

Keely was a police officer for the Michigan State Police with a special deputization to work full time for the United States Marshal Service ("USMS") as part of a federal task force focused on apprehending fugitives. The USMS task force "prioritizes warrants for individuals charged with violent crimes against persons, weapons offenses, [and] felony drug offenses as well as individuals who have a criminal history of violent crimes." *Keely*, 2024 WL 3934001, at *3.

### B. Sterling's Criminal History and Warrants for His Arrest

State officials brought Sterling's case to the attention of the USMS task force. *Id.* at *4. Detective Sergeant Ross Eagan supervises a local police task force—known as the "Metro pattern crimes team" or "MPACT"—consisting of four detectives from the Wyoming, Kentwood, and Kent County sheriff's offices. *Id.* In January 2024, MPACT attempted to locate Sterling in order to arrest him under multiple active warrants for his arrest. *Id.* There were six such warrants at the time: two felony warrants, two bench warrants, and two warrants for probation violations. (4/21/2025 Hr'g Tr. 13, ECF No. 103.) According to Eagen, one of the felony warrants was for a domestic violence incident in which Sterling was accused of "brandishing a handgun during an argument with his father, physically assaulting his father, and leaving the scene saying, hey, . . . I'm not going back to prison." (*Id.*) Sterling's criminal history also included convictions for larceny from a person, carrying a concealed weapon, and possession of a weapon as a felon. (*Id.* at 16, 277, 283.) And MPACT believed that Sterling had fled from local police in January 2024. (*Id.* at 15-18.)

2

MPACT used various methods of investigation and surveillance to determine Sterling's location, including placing a camera near his residence. (*Id.* at 15.) In early April of 2024, MPACT was able to locate him and set about making plans to apprehend him on April 17. Due to the safety risks involved in apprehending someone with Sterling's history, MPACT contacted the USMS for additional assistance. (*Id.* at 15-16.) The USMS task force agreed to assist with Sterling's arrest.

### C. Task Force Briefing

At a meeting on the morning of April 17, Eagen briefed the officers participating in the attempted arrest of Sterling, including several members of MPACT, Keely, and four or five other members of the USMS task force. (*Id.* at 15.) Eagen discussed Sterling's criminal history, his active arrest warrants, and MPACT's belief that Sterling had fled from police on a previous occasion. (*Id.* at 14-15.) Eagen also relayed that social media posts suggested Sterling was in possession of marijuana and firearms. (*Id.* at 16.) And several days earlier, the camera placed near Sterling's home had captured video of him walking outside with what appeared to be a "bulge" in his waistband area consistent with a concealed firearm. (*Id.* at 18.)

When discussing how to apprehend Sterling, the officers agreed that the safest way to proceed would be to try and arrest him in the open while he was on foot, rather than at his house or in his vehicle. (*Id.*) At his house, Sterling presented a greater threat to officers because he would be more likely to have access to weapons or to barricade himself inside. (*Id.* at 17.) If in his vehicle, Sterling posed a danger to the public if he attempted to drive away. (*Id.* at 18.)

### D. Attempted Arrest of Sterling

After the briefing, officers found Sterling at a Speedway gas station, kneeling next to his vehicle. Several officers drove up to the gas station to block his vehicle, but he immediately fled on foot, running south across a two-lane road, through the parking lots of two businesses, and

toward a Burger King restaurant. Officers Keely and Ellis followed him in their respective vehicles. Officer Eagen chased Sterling on foot, telling him to stop and to get on the ground. Sterling did not stop. He continued running until he approached the northwest corner of the Burger King. He briefly changed direction and headed east but then swerved north to avoid a bystander's vehicle entering the parking lot. He abruptly stopped when he saw a marked police cruiser driven by Officer Ellis heading toward him.



(Eagan Bodycam Video 11:25:11.)

Sterling then went south again, running past the northeast corner of the Burger King toward a drive-through window and side entrance to the restaurant. Ellis got out of his cruiser to follow on foot. By this time, Keely was entering the Burger King parking lot from the north in his unmarked Hyundai Palisade with its police lights activated.

4



(Ellis Bodycam Video 11:25:15.)

Thomas Langley, a traffic accident reconstructionist, reviewed video evidence as well as data gleaned from Keely's vehicle. According to Langley's analysis, Keely briefly accelerated in the direction of the door to the restaurant and then applied his brakes when he was around fifteen feet away from Sterling, about two seconds before impact. (4/21/2025 Hr'g Tr. 75-76.) Keely continued braking with increasing force until his vehicle skidded on the wet pavement and then went over the curb near the door. (*Id.* at 78-79.) Keely was not driving directly at Sterling; rather, his path, which curved slightly toward the restaurant, was aimed at the entrance to the Burger King in front of Sterling. (*Id.* at 75.) Sterling turned his head and saw Keely's vehicle approach about a second before impact (Ellis Bodycam Video 11:25:16). Nevertheless, Sterling continued forward until he and the vehicle collided with one another.



(Ellis Bodycam Video 11:25:17.)

Some data from the vehicle's data recorder reported a 170-degree turn of the steering wheel to the right and back at or around the moment of impact with Sterling, but Langley dismissed this data as an "anomaly" because the turn occurred for only one-tenth of a second before the steering wheel returned to its previous position, which is physically impossible for a person to accomplish. (4/21/2025 Hr'g Tr. 74, 114, 118.)  Also, the turn did not show up in the video when looking at the orientation of the front right wheel.  (*Id.* at 83, 85-87, 109-110, 115, 117-18, 121.)  That wheel kept its orientation, which was turned slightly toward the restaurant.  (*Id.*)

When Sterling and the vehicle collided, his body hit the car above the front passenger-side headlight and then careened into the exterior wall of the Burger King.  Keely's vehicle proceeded forward, its front right tire going over the curb separating a raised walkway from the parking lot, until it came to a rest a couple feet shy of the restaurant door with the fender over the front right wheel pinning Sterling to the wall.



(Ellis Bodycam Video 11:25:18.)

Keely then moved the vehicle away from the wall while others secured Sterling (who was still conscious) in handcuffs and arranged for emergency medical support. Sterling died from his injuries after arriving at the hospital.

## II. STANDARD

Keely seeks dismissal of the criminal complaint under Rule 12(b)(1) of the Federal Rules of Criminal Procedure. Keely argues that, because he was a federal officer when attempting to arrest Sterling, he is immune from prosecution under the Supremacy Clause of the Constitution.

It is "well settled" that a state cannot prosecute a federal officer for a violation of state law if (1) the officer "was performing an act which he was authorized to do by the law of the United States" and (2) "in performing that authorized act, [the officer] did no more than what was necessary and proper for him to do." *Kentucky v. Long*, 837 F.2d 727, 744 (6th Cir. 1988). The second component "contains both a subjective and an objective element." *Id.* at 745.

> On the subjective side, the [officer] must have an honest belief that his action was justified. On the objective side, his belief must be reasonable. We note that . . . an [officer] is not required to show that his action was in fact necessary, or in retrospect

7

> justifiable. He must only show that he reasonably thought it to be necessary and justifiable.

*Id.*

Procedurally, when a federal officer raises a defense under the Supremacy Clause, the State must "come forward with [an] evidentiary showing sufficient at least to raise a *genuine* factual issue whether the federal officer was acting pursuant to the laws of the United States and was doing no more than what was necessary and proper for him to do in the performance of his duties." *Id.* at 752 (emphasis in original). Although a court reviewing a motion to dismiss an indictment typically assumes the truth of the allegations in the indictment, the State cannot meet its burden "merely by way of allegations." *Id.*

When reviewing the evidence, the Court's role is to decide "questions of law rather than fact." *Id.* at 750. The Court "may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motion so long as the court's findings . . . do not invade the province of the ultimate finder of fact." *Id.*

### III. ANALYSIS

**A. Performing an Authorized Act**

Keely argues that he was authorized by the laws of the United States to apprehend Sterling, which is what he was attempting to do when his vehicle collided with Sterling. Indeed, there is no question that Keely had authority under federal law to execute the warrants for Sterling's arrest.

The State's argument in response has shifted over time. After Keely filed his motion to dismiss, the State responded by arguing that Keely acted outside the scope of his authority because he had criminal intent. According to the State, there was evidence that Keely acted with "malice" necessary to support a charge of second-degree murder under Michigan law because he turned his

8

wheel sharply toward Sterling in the seconds before impact. That conduct, it seemed to argue, suggested that Keely *intended* to kill or harm Sterling. (Pl.'s Resp. Br. 20-21, ECF No. 43.)

Alternatively, the State argued that there was evidence that Keely intended "to do an act that is in obvious disregard of life-endangering consequences," which would also satisfy the intent necessary for second-degree murder. (*Id.* at 20 (quoting *People v. Werner*, 659 N.W.2d 688, 692 (Mich. Ct. App. 2002).) And the State argued that Keely could be guilty of involuntary manslaughter for "acting in a grossly negligent manner or while committing an unlawful act that was inherently dangerous to human life." (*Id.* at 22 (citing *People v. Albers*, 672 N.W.2d 336, 339 (Mich. Ct. App. 2003).)

At the evidentiary hearing, however, the State presented no evidence that Keely turned his wheel sharply toward Sterling or intentionally killed him. The video evidence does not support that theory, and the State offered no evidence to rebut Langley's testimony that it would have been physically impossible for Keely to turn his steering wheel 170 degrees and back in one tenth of a second, as the vehicle data recorder reported.

After Langley's testimony, the State disclaimed any argument that Keely intentionally killed or harmed Sterling by steering toward him or otherwise:

> [T]his testimony from [Langley] was that there's no indication from him that the wheel was intentionally turned. Well, we've never argued that Mr. Keely intentionally turned to hit Samuel Sterling . . . .
>
> * * *
>
> We don't argue that Mr. Keely tried to kill or was intentionally trying to strike [Sterling] with the vehicle. That's ultimately what happened. But the argument was it was a bad idea to drive towards him, given the situation that was known at that particular time.

(4/21/2025 Hr'g Tr. 132, 134.)

Regardless, even in the absence of an intent to kill or injure, the State is correct that Keely could potentially be guilty of second-degree murder or involuntary manslaughter under Michigan law if he had some other intent, such as intending to do an act in disregard of life-endangering consequences or acting with gross-negligence resulting in death.  The State apparently contends that because there is evidence of such criminal intent, Keely was acting outside the scope of his authority and is therefore not entitled to immunity.

The Court is not persuaded by the State's argument.  In effect, the State is arguing that if Keely violated Michigan criminal law, he is not entitled to immunity.  But that argument would eliminate the immunity defense for all federal officers charged with crimes under state law.  In all such cases, a state could argue that, by acting with sufficient intent to violate state law, even if that intent amounted to gross negligence, the officer was acting outside the scope of their federal authority.  That result cannot be correct for a defense based on the Supremacy Clause.  Indeed, the appropriate test is whether the officer's conduct was "authorized . . . by the law of the United States," *Long*, 837 F.2d at 744, not whether their conduct was authorized by state law.

The State cites several cases to support its argument.  None of them are directly on point.  In *United States ex rel. Drury v. Lewis*, 200 U.S. 1 (1906), the Supreme Court considered whether to grant a habeas petition by a member of the United States Army arrested by state officials for shooting and killing a suspect.  *Id.* at 7-8.  From the evidence, it was not clear whether the suspect had been attempting to evade arrest or had surrendered before he was shot.  *Id.* at 8.  The government conceded that, if the suspect had surrendered before he was shot, the petitioner would not have been acting in furtherance of a "duty imposed by the Federal law."  *Id.*  Under these circumstances, the Court decided that the district court did not abuse its discretion in denying the petition because the state court could resolve the factual dispute.  *Id.*  The Court did not, as the

10

State contends here, conclude that acts by federal officers committed with any form of intent deemed sufficient to qualify for a criminal offense under state law would put those acts outside the scope of their authorization and therefore beyond the reach of immunity.

Similarly, in *Castle v. Lewis*, 254 F. 917 (8th Cir. 1918), the Court of Appeals for the Eighth Circuit declined to grant a habeas petition brought by federal officers who shot and killed a man suspected of illegally transporting whiskey. *Id.* at 919. As in *Drury*, there was a conflict in the evidence about what occurred. The officers claimed they had told the suspect to stop but he refused to do so and attempted to flee, so they fired on him. *Id.* However, other evidence indicated the man received no warning at all before being fired upon. *Id.* at 923. The court concluded that the district court did not abuse its discretion in denying the petition for release before trial; the "time and mode" for considering their immunity defense was "subject to the discretion of the federal courts and judges." *Id.* at 926. By contrast, Keely has not filed a habeas petition while in state custody, and federal law requires this Court to consider his immunity defense at this stage.

The same kind of facts distinguish *Birsch v. Tumbleson*, 31 F.2d 811 (4th Cir. 1929) from the present case. There, federal game wardens accused of shooting and killing two hunters filed habeas petitions while in state custody. *Id.* at 811. As in *Castle* and *Drury*, the nature of their conduct was unclear. According to the petitioners, they fired their weapons at the hunters in self-defense after one of the hunters fired at them. *Id.* at 811-12. However, a witness stated that the officers fired without warning and the hunters did not use their weapons at all. *Id.* at 812. The court declined to grant relief, noting that it was not clear whether the officers "exercised only such authority as was necessary and proper in their capacity as federal officers . . . and did not, in so doing, exceed such authority." *Id.* at 814. In light of the disputed facts, the Court left it to the state court to decide the matter. *Id.* at 816.

11

As indicated, in *Drury*, *Castle*, and *Birsch*, courts refused to grant habeas relief, in part, because there was conflicting evidence about what the officers had done. The courts declined to resolve those factual disputes. This Court's analysis is similarly constrained. As discussed above, the Court cannot resolve genuine disputes of fact. *See Long*, 837 F.2d at 750. But unlike those cases, the relevant facts here are not disputed. There is no genuine dispute about the risks involved in chasing Sterling and the need to curtail his flight in light of his criminal history and the likelihood that he was armed. And there is no genuine dispute about what Keely did. The entire incident is captured on video.

Importantly, the evidence in *Drury*, *Castle*, and *Birsch*, when construed in the light most favorable to the state, tended to show that the officers had no justification for their actions, which if true, apparently meant that they could not have been acting under their federal authority. As discussed in more detail below, however, those are not the circumstances here. In short, the foregoing cases do not stand for the proposition that evidence supporting any form of criminal intent by a federal officer bars them from obtaining immunity. Instead, the cases suggest that *some* acts may be so lacking in justification that they fall outside the scope of an officer's federal authority.

The Court of Appeals for the Ninth Circuit echoed the latter point in another case identified by the State as support for its argument, *Idaho v. Horiuchi*, 253 F.3d 359 (9th Cir. 2001), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001). There, the court cited *Drury* for the proposition that "a state may prosecute federal agents if they have acted unlawfully in carrying out their duties." *Horiuchi*, 253 F.3d at 366. But it noted that "[c]ases since *Drury* have refined the standard applicable to the immunity inquiry." *Id.* To be immune, an officer must "do no more than is necessary and proper in the performance of his duty." *Id.* (quoting *Clifton v. Cox*, 549 F.2d 722,

730 (9th Cir. 1977)). In other words, "[f]ederal agents will be immune from state prosecution if they acted in an objectively reasonable manner in carrying out their duties." *Id.* But "[w]hen an agent acts in an objectively unreasonable manner, th[e] limits [on immunity] are exceeded, and a state may bring a criminal prosecution." *Id.* at 377. The latter principle is consistent with the necessary and proper test in *Long*. In other words, if the officer's actions are necessary and proper *and* in furtherance of the officer's duties, those actions are within the scope of their authorization.

Contrary to the State's contention, the court in *Horiuchi* did not hold that evidence of any criminal intent under state law necessarily disqualifies a federal officer from claiming immunity under the Supremacy Clause. Instead, that court declined to grant immunity after concluding that the officer's use of force in that case was not "objectively reasonable as a matter of law." *See id.* Accordingly, the State's position is unsupported.

To the extent criminal intent is relevant, cases like *Horiuchi* suggest that such intent is already accounted for in the subjective prong of the necessary and proper test. According to *Long*, that test implicitly examines whether the officer had a "motive other than to do his job under circumstances as they appeared to him." *Long*, 837 F.2d at 744. Thus, for instance, an officer who acts solely "out of malice" would not satisfy that test. *See New York v. Tanella*, 281 F. Supp. 2d 606, 620 (E.D.N.Y. 2003). Put another way, such an officer would not have an "honest and reasonable belief that what he did was necessary" to perform his job. *Long*, 837 F.2d at 744. The Court will discuss the subjective prong of the necessary and proper test in the next section, below. That analysis satisfies the test for immunity as set forth in *Long*.

As another court put it, an authorized act is one that "bear[s] some reasonable relation to and connection with the duties and responsibilities of the official." *Clifton*, 549 F.2d at 726 (quoting *Scherer v. Morrow*, 401 F.2d 204, 205 (7th Cir. 1968)); *accord Baucom v. Martin*, 677

13

F.2d 1346, 1350 (11th Cir. 1982) ("[T]he necessary authority [to support the immunity defense] could be derived from the general scope of the officer's duties."). There is no dispute that apprehending Sterling was one of Keely's duties as a member of the USMS task force, and that he was attempting to fulfill this duty on April 17, 2024. Accordingly, he satisfies the "authorized act" prong of the test for immunity.[1]

### B. Necessary and Proper Action

The bulk of the parties' arguments focus on whether Keely's actions were necessary and proper to apprehend Sterling. As discussed above, this test has a subjective prong and an objective prong.

#### 1. Subjective Belief

Examining the subjective prong first, there is no genuine dispute that Keely honestly believed that his actions were justified for apprehending Sterling. In a statement after the incident, Keely reported the following:

> My observations were that [Sterling] was headed directly towards the drive-thru window and side entrance door [of the Burger King] . . . . My overwhelming impression was that Sterling was trying to evade me and other detectives by running into the restaurant. Given the time of day, it was likely that Burger King was occupied by several employees and customers. My training and experience from over twelve years of fugitive work and the facts from the earlier briefing that Sterling is known to carry a weapon, made me instantly very concerned that if he were to gain access to the restaurant, innocent lives could be put at risk. I also know from my training and experience that encounters with fleeing, resisting dangerous felons are exponentially more difficult and dangerous in a confined area with civilians. For the safety of Sterling, my team and the public, my primary objective then became to get to the restaurant door before Sterling did.
>
> * * *
>
> . . . I drove in at an angle which I believed would cut Sterling off from the door and cause him to change direction away from the Burger King lobby. This would also

---

[1] To the extent the State contends Keely's actions were not authorized by federal law because they violated the rules governing the appropriate use of force under the Fourth Amendment, the Court will address that contention in the next section when discussing whether Keely's actions were necessary and proper.

14

> cause Sterling to have to stop or change directions, slowing him down. Placing my vehicle in his path would also allow me to exit my vehicle and attempt to apprehend Sterling.

(Massock Rep. 15, Hr'g Ex. 4.)

The State does not meaningfully address the subjective prong in its post-hearing briefing. Moreover, its own expert on the use of force, Dr. Marc Edward Brown, conceded that there is "no doubt" that Keely subjectively believed that "Sterling getting into the Burger King was a threat to the public." (4/21/2025 Hr'g Tr. 260.) Brown also conceded that there was no evidence that Keely intentionally hit Sterling with the vehicle. (*Id.* at 257.) Finally, the path of Keely's vehicle toward the door of the restaurant rather than toward Sterling indicates that Keely's goal was to contain Sterling and to prevent him from entering the restaurant rather than to injure him. Thus, Keely has satisfied the subjective prong.

### 2. Objective Reasonableness

As to the objective reasonableness of Keely's beliefs, those beliefs are consistent with the other evidence, including the evidence of what Keely knew about Sterling's violent criminal history, Sterling's propensity to flee, the likelihood that Sterling was armed, Sterling's sustained flight from the officers on that day, and Sterling's proximity to the Burger King entrance when Keely's vehicle collided with him.

Keely's expert on the use of force and tactical operations, Special Agent Paul Massock, concluded that Keely's actions were consistent with USMS "training, practice and policies," and were "appropriate, reasonable, and necessary" for Keely to fulfill his duties. (*Id.* at 144-45.) Although the State's expert on the use of force, Dr. Brown, disagreed with this conclusion, he agreed with Massock on every important point.

For example, Massock thought it reasonable for Keely to assume that Sterling was armed. (*Id.* at 146.) Brown agreed. (*Id.* at 245, 254, 256.) Massock thought it was reasonable for Keely

to use a vehicle to pursue Sterling instead of chasing him on foot because vehicles allow officers to catch up to fleeing suspects and contain them.  (*Id.* at 154-55.)  Brown agreed.[2]  (*Id.* at 231, 237.)  In addition, Massock thought it reasonable for Sterling to attempt to get ahead of Sterling and contain him because it was reasonable to believe that Sterling would change direction when he saw a vehicle approaching.  (*Id.* at 187.)  Brown agreed.  (*Id.* at 259.)

Massock also believed it would have been "extremely" dangerous for Sterling to enter the Burger King restaurant because Sterling could have taken someone hostage or ambushed officers who entered.  (*Id.* at 157.)  Massock testified that law enforcement officers are trained to follow a "hierarchy of safety priorities" that puts the safety of uninvolved civilians before the officers or a suspect.  (*Id.* at 158.)  For Keely, that meant taking "decisive action" to ensure the safety of anyone inside the restaurant.  (*Id.* at 159.)  Similarly, Brown acknowledged that it was possible that Sterling would try to enter the Burger King and that it was reasonable for Keely to believe that, if Sterling did so, he posed an "imminent danger" to the public.  (*Id.* at 256, 261.)  Brown also agreed that Keely had a duty to apprehend Sterling as quickly as he could, and to do so while Sterling was still visible because the more a suspect flees the more danger they create for themselves, for officers, and for the public.  (*Id.* at 262-63.)

Ultimately, Dr. Brown believed that Keely should not have driven up onto the walkway by the entrance to the Burger King and that Keely made "a bad judgment call" by driving "too close" to Sterling.  (*Id.* at 253, 257, 260, 264.)  Brown also thought it was "potentially" unreasonable for Keely to drive in the wrong direction in a drive through lane.  (*Id.* at 252.)  However, Brown's opinions about driving onto the walkway and driving too close to Sterling do not account for the

---

[2] Deputy U.S. Marshal Matthew Ortiz testified that officers like Keely carry 30 to 50 pounds of equipment on them, making it difficult for them to chase suspects on foot.  (4/21/2025 Hr'g Tr. 34.)  Also, a vehicle is useful because it has lights and sirens that alert the public about police activity.  (*Id.* at 34-35.)  In light of this testimony, Dr. Brown acknowledged that vehicles provide "a sizeable advantage" when pursuing a suspect.  (*Id.* at 237.)

fact that Keely's vehicle slid on the wet pavement while he was braking, which was not entirely within Keely's control. But even if Brown is correct that Keely exercised bad judgment, that error does not defeat immunity. "The case law teaches that a mistake in judgment or a 'botched operation,' so to speak, will not of itself subject a federal agent to state court prosecution." *Long*, 837 F.2d at 745; *see Clifton*, 549 F.2d at 728 (noting that immunity "does not require [an officer] to show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be"). Thus, Dr. Brown's opinions and testimony do not create a genuine dispute about the reasonableness of Keely's beliefs or actions.

   The State notes that several officers chasing Sterling got out of their vehicles and chose to pursue him on foot. It argues that Keely should have done the same. However, Dr. Brown agreed that it was reasonable for Keely to use his vehicle. (4/21/2025 Hr'g Tr. 231, 237.) Indeed, as Massock testified, Keely was the only one who could have stopped Sterling from entering the restaurant; the other officers were too far behind. (*Id.* at 170.) And at any rate, Keely's choice to continue the pursuit in his vehicle is the sort of "split-second" judgment call an officer must make "in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The Court must assess Keely's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

   The State emphasizes that Keely did not know for certain that Sterling was armed because officers did not see a weapon in his possession on that particular day. Similarly, when discussing whether Sterling possessed a firearm, Dr. Brown suggested that an officer should act based on the circumstances as they appear to him at that time, and on April 17, 2024, no one saw a gun in Sterling's hands. These statements are correct; however, the pertinent question is whether it was reasonable for Keely to believe, based on the *totality of the circumstances*, that Sterling possessed

17

a firearm. *See Barnes v. Felix*, 605 U.S. ---, No. 23-1239, 2025 WL 1401083, at *4 (May 15, 2025) ("[I]nquiry into the reasonableness of police force requires analyzing the 'totality of the circumstances,'" which "has no time limit." (quoting *County of Los Angeles v. Mendez*, 581 U.S. 420, 427-28 (2017)). Here, based on the information Keely had received about Sterling's history and prior behavior, it was reasonable for Keely to believe Sterling was armed and to treat him as such, as Dr. Brown acknowledged. (4/21/2025 Hr'g Tr. 245, 254, 256.) Sterling could have been carrying a concealed firearm that would not have been visible to the officers, as Dr. Brown also acknowledged. (*Id.* at 245-46.)

The State also argues that it was unreasonable for Keely to believe that Sterling would attempt to enter the Burger King restaurant. The Court disagrees. Sterling was clearly attempting to evade arrest. By the time he reached the side of the restaurant, there were several officers chasing him on foot and at least one more pursuing him in a police vehicle. A truck blocked most of Sterling's path at the drive through window, which was past the door. He had few places left to run other than inside the restaurant. Of course, no one can know for certain what Sterling would have done, but Keely's prediction was objectively reasonable.

Finally, to the extent the Fourth Amendment plays a role in assessing the reasonableness of Keely's conduct or his authority to act under federal law, the Court finds that his actions were reasonable. Such an assessment

> requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Graham*, 490 U.S. at 396.

All the foregoing factors weigh in Keely's favor. Keely attempted to enforce several warrants for Sterling's arrest, at least one of which stemmed from a charge that Sterling had

engaged in domestic violence by brandishing a handgun and physically assaulting his father. That offense is a relatively serious one. Sterling was actively attempting to evade arrest, leading multiple officers on an extended chase in a populated area. Because Keely and the other officers reasonably believed Sterling was armed, they had good reason to believe that Sterling posed a significant threat to the safety of officers and the public. That threat would have increased if Sterling had made it inside the Burger King restaurant. Considering these factors, even if Keely's actions were risky, he made a reasonable decision to try to block or deter Sterling from entering the restaurant in order to prevent more serious risks to the public and to the officers created by Sterling's flight.

## IV. CONCLUSION

For the reasons discussed, the State has not presented sufficient evidence to create a genuine dispute about whether Keely acted pursuant to federal law and did no more than what was necessary and proper for him to do in attempting to apprehend Sterling. Accordingly, Keely is entitled to immunity under the Supremacy Clause of the U.S. Constitution. The Court will grant his motion and dismiss the case.

The Court will enter an order and judgment in accordance with this Opinion.

Dated: May 28, 2025                           /s/ Hala Y. Jarbou
                                              HALA Y. JARBOU
                                              CHIEF UNITED STATES DISTRICT JUDGE